UNITED STATES of America,
Plaintiff,

v.

Susan HAMPTON, and Sharon
Mathis, Defendants.

Nos. 00–10129–01–JTM,
00–10129–02–JTM.

United States District Court,
D. Kansas.

March 16, 2001.

Lee Thompson, Jeffrey E. Goering, Thompson Stout & Goering, LLC, Wichita, KS, for Susan Hampton.

Steven K. Gradert, Office of Federal Public Defender, Wichita, KS, for Sharon Mathis.

Debra L. Barnett, Office of U.S. Atty., Wichita, KS, for U.S.

## MEMORANDUM AND ORDER

MARTEN, District Judge.

This matter comes before the court on defendant Hampton's motion to dismiss, which defendant Mathis joined; on defendants' motions for a bill of particulars; and, on defendants' separate motions to suppress evidence. The motions are fully briefed and the court heard arguments and received evidence at a March 8, 2001 hearing. At the hearing, the court ruled on several of the motions, as set out below, and reserved ruling on the remainder. As to the motions the court took under advisement, the court denies defendant Hampton's motion to dismiss in its entirety; denies the motions to suppress seized evidence; and, denies the motion to suppress defendant Hampton's statement.

## I. Background

Defendant Susan Hampton is president of the Climate Control Institute, Inc. ("CCI"), a trade school with locations in Wichita, Kansas and Memphis, Tennessee. Defendant Sharon Mathis is Hampton's daughter and employee of CCI. CCI students were eligible for and received a variety of federal loans and grants, which were

all Title IV programs, 20 U.S.C. §§ 1070–1099. As part of the federal regulatory scheme, the Department of Education ("DOE") could and did conduct "program reviews" and audits of CCI's compliance with the applicable rules governing the receipt and repayment of Title IV funds. The DOE reviewed CCI in 1989, 1994, and finally in 1998. During the first two reviews, the DOE found CCI liable for late or incorrect refunds of student loans and other technical deficiencies. Each time, the DOE gave CCI an opportunity to respond to the findings. In the 1989 review, the DOE gave CCI repayment instructions in a final program review determination letter. At the conclusion of the 1994 review, CCI gave the DOE sufficient documentation and assurances in its response.

A similar process occurred in the 1998 review. However, the DOE allegedly found evidence that CCI's failure to refund student loans was serious and potentially criminal. CCI responded to the initial findings, but unlike the previous reviews, the DOE did not provide CCI with a final determination letter stating repayment instructions. Instead, the DOE's Office of the Inspector General ("OIG") became involved and sought an indictment against Hampton and Mathis. On October 18, 2000, both defendants were indicted on one count of conspiracy (18 U.S.C. § 371), thirty-one counts of failure to make a refund (20 U.S.C. § 1097), and one count of mail fraud (18 U.S.C. § 1341). Two days later, OIG officers executed a search warrant at CCI and seized many of CCI's business records and other evidence.

## II. Bench Rulings from March 8, 2001 Hearing

As noted above, the court issued bench rulings on several of the present motions. Specifically, the court ruled on the motion for a bill of particulars and on portions of the motion to dismiss. As to the bill of particulars, the court granted the defen-

dants' motion in part by ordering the government to reveal the identity of any unindicted co-conspirators and any CCI employees who the government alleges to have criminal culpability. The court found that without such information, the defendants may be subject to prejudicial surprise or double jeopardy problems. The court denied defendants' request as it related to the identities of non-culpable CCI employees and to the factual predicate for the offense of conspiracy. The court found that such information is tantamount to a discovery request and thus is inappropriate for a bill of particulars.

■ In her motion to dismiss, defendant Hampton cites three bases for dismissal: facial insufficiency of the indictment, the defense of entrapment by estoppel, and insufficient factual basis for indictment. At the hearing, the court denied Hampton's motion on the first two bases and reserved ruling on the third. Defendant Hampton argued that all thirty-three counts of the indictment were facially insufficient. Relative to the sufficiency of the indictment relating to violations of 20 U.S.C. § 1097, Hampton argues that *Bates v. United States*, 522 U.S. 23, 118 S.Ct. 285, 139 L.Ed.2d 215 (1997), requires the government to specifically allege that the defendants intended to convert the loan proceeds for their own use or the use of a third party. The instant indictment merely tracks the language of the statute by alleging that defendants knowingly and wilfully "embezzles, misapplies, steals, obtains by fraud, false statement, or forgery, or fails to refund any funds, . . ., in that the defendants failed to return unearned refunds to the lending institutions . . ." Indictment, filed October 18, 2000, at 2–3.

■ Defendant Hampton extends the holding in Bates beyond its scope. Bates simply holds that intent to defraud is not a required element of § 1097(a). *Id.* at 33.

The Court does not disagree with the Seventh Circuit's interpretation of § 1097, which requires the government to show conversion of the funds for personal or third party use. However, the Court did not adopt that interpretation. In fact, the Court indicated that the legislative history of § 1097(a) suggests that "failure to pay refunds does constitute criminal misapplication under current law." *Id.* at 32 (citing H.R. Conf. Rep. No. 102–630, p. 513 (1992)). The present indictment does more than simply allege that the defendants committed innocent maladministration of a business enterprise. The indictment alleges that defendants knowingly and wilfully failed to pay refunds, which actions constitute, in themselves, criminal misapplication. Counts 2–32 of the indictment are thus sufficient on their face. The conspiracy count alleges that the overt acts are those alleged in Counts 2–32. The conspiracy charge is thus sufficient on its face. Finally, defendant Hampton argued that Count 33 is insufficient because it fails to allege that defendants were seeking to obtain property by mailing fraudulent copies of canceled checks to the Nebraska Student Loan Program. The court found this argument flawed because the mail fraud statute extends to mailings sent in order to conceal a fraudulent scheme. See *United States v. Trammell,* 133 F.3d 1343, 1352 (10th Cir.1998) ("In a mail fraud case it is not necessary that the mailing predate the defendants' receipt of the money. Mailings sent after the defendant has obtained the victim's money are considered in furtherance of the scheme for purposes of § 1341 if they facilitate concealment of the scheme."). The court thus found the indictment facially sufficient.

Finally, the court ruled that defendant Hampton's assertion of the "entrapment by estoppel" defense was creative but inapplicable. The essence of the defense is that the defendants were waiting for the repayment schedule in order to repay their liabilities and that they were entitled to rely on the DOE's prior representations and conduct in that regard. In order for this defense to apply, the erroneous advice of officials had to cause the alleged violations of law. See *Raley v. Ohio,* 360 U.S. 423, 79 S.Ct. 1257, 3 L.Ed.2d 1344 (1959). Here, defendants allegedly failed to make the required returns before the DOE initiated the 1998 program review. The "entrapment by estoppel" defense simply does not apply where the criminal activity predates the government's direct involvement. The court thus found defendant Hampton's argument inapplicable.

### III. Motion to Dismiss for Insufficient Factual Basis

 Defendant Hampton's final argument in her motion to dismiss is that the undisputed facts in this case demonstrate the absence of a sufficient factual basis for indictment under 20 U.S.C. § 1097(a). Generally, defendants may not challenge, by pretrial motion, the strength or weakness of the government's case, or the sufficiency of the government's evidence to support a charge. *United States v. King,* 581 F.2d 800, 802 (10th Cir.1978). The court should test an indictment solely on the basis of the allegations made on its face, and such allegations are to be taken as true. *United States v. Sampson,* 371 U.S. 75, 78–79, 83 S.Ct. 173, 174–75, 9 L.Ed.2d 136 (1962). Courts should refrain from considering evidence outside the indictment when testing its legal sufficiency. Nonetheless, defendant Hampton urges that in certain circumstances, the court may consider the sufficiency of the facts supporting the indictment.

 The Tenth Circuit has upheld a pretrial dismissal under Rule 12(b) based on the insufficiency of the evidence where the underlying facts were essen-

tially undisputed and the government failed to object to the district court's resort to evidence beyond the four corners of the indictment. *United States v. Brown*, 925 F.2d 1301 (10th Cir.1991); *United States v. Wood*, 6 F.3d 692 (10th Cir.1993). However, the circuit has instructed that the court should consider the sufficiency of facts outside the face of the indictment only in those very limited circumstances outlined above. See *United States v. Hall*, 20 F.3d 1084, 1087 (10th Cir.1994) ("we read Brown and Wood as authority which allows a district court to dismiss charges at the pretrial stage under the limited circumstances where the operative facts are undisputed and the government fails to object to the district court's consideration of those undisputed facts in making the determination regarding a submissible case ... We note, however, that such a scenario is not likely to recur and we caution both the trial courts and counsel that the procedure here employed is indeed the rare exception."). Defendant Hampton asserts that the critical facts of this case are undisputed. The government contests that characterization and further objects to the court's consideration of facts outside the indictment. The court finds that Hall precludes the court's consideration of the sufficiency of facts outside the indictment in these circumstances. The "rare exception" outlined in Brown and Wood is inapplicable to this case. The court thus denies defendant Hampton's motion to dismiss on the grounds of factual insufficiency.

## IV. Motion to Suppress Seized Evidence

Defendants filed independent motions to suppress the documents and other evidence seized from the CCI premises on October 20, 1998. On that day, federal officers executed a search warrant on the premises. The magistrate judge issued the search warrant on October 19, 1998. The warrant specifically stated the place to be searched (Search Warrant, October 19, 1998, Attachment A) and included a three-page list of items to be seized (*Id.* at Attachments B–C). The affidavit of Kris Kanakares, the OIG agent in charge of the CCI investigation, supported the warrant. During the search, officers seized approximately 70 boxes of files, documents, and other items. Additionally, the agents took statements from many CCI employees.

The court first considers whether the warrant was so broad in its recitation of seizable items that it constitutes an impermissible general warrant. "Under the Fourth Amendment, every warrant must 'particularly describ[e]' the place to be searched, and the persons or things to be seized'—a requirement that prevents a 'general exploratory rummaging in a person's belongings.'" *United States v. Emmons*, 24 F.3d 1210, 1216 (10th Cir.1994). "The Fourth Amendment requires warrants to describe particularly the things to be seized, so that 'nothing is left to the discretion of the officer executing the warrant.'" *United States v. Robertson*, 21 F.3d 1030, 1033 (10th Cir.1994). "The test applied to the description of the items to be seized is a practical one." *United States v. Janus Industries*, 48 F.3d 1548, 1554 (10th Cir.1995).

In general, a warrant is sufficiently specific if it "enables the searcher to reasonably ascertain and identify the things authorized to be seized." *United States v. Wolfenbarger*, 696 F.2d 750, 752 (10th Cir.1982) (quoting *United States v. Wuagneux*, 683 F.2d 1343, 1348 (11th Cir. 1982), *cert. denied*, 464 U.S. 814, 104 S.Ct. 69, 78 L.Ed.2d 83 (1983)). However, even a "warrant that describes items to be seized in broad and generic terms may be valid if the description is as specific as circumstances and nature of the activity

**1268**

under investigation permit." *United States v. Harris,* 903 F.2d 770, 774 (10th Cir.1990). "Even if generic descriptions are necessary, however, 'the fourth amendment requires that the government describe the items to be seized with as much specificity as the government's knowledge and circumstances allow, and warrants are conclusively invalidated by their substantial failure to specify as nearly as possible the distinguishing characteristics of the goods to be seized." *United States v. Leary,* 846 F.2d 592, 600 (10th Cir.1988). In evaluating the sufficiency of the warrant, the court should "read together all properly incorporated or referenced components of the warrant, including the attached application and affidavit." *United States v. Occhipinti,* 998 F.2d 791, 799 (10th Cir.1993). "The knowledge of the executing officer can be considered in determining the sufficiency of the description." *Id.*

■ Defendants rely on the cases of *United States v. Leary,* 846 F.2d 592, 594 (10th Cir.1988), and *Voss v. Bergsgaard,* 774 F.2d 402, 404 (10th Cir.1985), to support suppression on the grounds of overbreadth. Both Voss and Leary are distinguishable from this case in several respects. First, unlike those two cases, this was not a general warrant allowing seizure of all company records in their entirety. Rather, the warrant specifies the following materials:

a. CCI student records from July 1, 1994, to present, including attendance records, ledgers of student charges and payments, permanent record cards, tests and grade records, financial aid records, loan and grant records, enrollment verification reports, eligibility records, graduation records, drop out and expulsion records, and job placement records from July 1, 1994, to present.

b. Documents reflecting or relating to communications between students and CCI from July 1, 1994, to present.

c. CCI financial records for the period July 1, 1994, to present, including all payroll and financial statements, invoices, ledger books, disbursement journals, and all bank account information, including checks, statements, canceled checks, money orders, letters of credit, passbooks, certificates of deposits, deposit slips, unmailed refund checks, and credit card receipts and statements of CCI.

d. Documents reflecting or relating to unpaid federal grant and loan refunds from July 1, 1994, to present.

e. CCI personnel records from July 1, 1994, to present, including performance evaluations, attendance records, training records, resumes, and other recorded information regarding employees and officers.

f. Documents reflecting or relating to CCI staff meetings, delegation of authority, communications between employees and/or officers of CCI, and minutes of meetings from July 1, 1994, to present.

g. CCI Articles of Incorporation, partnership agreements, investments, contributions and distribution records, resolutions, charter, minutes and stock ownership records of CCI and any related business entities.

h. Internal correspondence, including directives, policy statements, price lists, and reference manuals relating to the recruitment and management of students at CCI.

i. Deleted.

j. Telephone and/or address books, lists, papers and documents identifying names, addresses and telephone numbers of the owners and operators of any related business entities.

k. Records involved in the acquisition, concealment, and transfer of assets.

l. Records involved in the transfer or concealment of currency.

m. Photographs and video tapes of assets.

n. Evidence of residency, occupancy and/or ownership of premises and locations described in the warrant including telephone and utility bills, canceled checks, envelopes, keys, rental agreements, warranty deeds, local, state, and federal tax returns.

o. Documents reflecting or relating to the acquisition, concealment and transfer of CCI property, assets or currency from July 1, 1994, to present.

p. Documents relating to any company that did business with CCI from July 1, 1994, to present, including contracts, purchase orders and any other supplier and vendor records, payments, and all correspondence with any supplier or vendor.

Search Warrant, October 19, 1998, Attachment B. In addition, Attachment C lists various computer information to be seized. Defendants do not take issue with the seizure of computer "zip" files, and the court will not address Attachment C in any further detail.

The warrant shows those items the Leary court specifically stated would save an otherwise invalid warrant: (1) the seizure of documents was limited, when possible, to those which concerned the crime(s) under investigation; (2) the seizure of documents was limited, when possible, to a specific period of time relating to the suspected crime(s); and (3) the Affidavit and Attachments were used during the search and described the criminal activities themselves rather than simply referring to the allegedly applicable statute.

Second, and also unlike Voss and Leary, agents executed the warrant here in a manner consistent with Attachments B and C. Agent Kanakares testified that all agents read both the Affidavit and Attachments in their entirety before executing the search. The Affidavits and Attachments were available at the scene and agents constantly referenced them in an effort to insure that seizures remained within their parameters. A review of the inventory shows that the items seized fell within the general parameters of the warrant Attachments.

Finally, the court finds the warrant to be similar to that upheld in *U.S. v. Hargus*, 128 F.3d 1358 (10th Cir.1997). In Hargas, the warrant was limited to some specific items, but also included several general categories, such as: "business records, receipts, invoices, accounts payable, and other records regarding oil and gas, salt water and other fluid transfers" and "any and all records relating to the business of Hargus Reclaimers and records pertaining to the purchase and sale of oil, oil by-products, salt water and other fluids." Considering the particularity requirement in view of these categories, the circuit held that the warrant was "sufficiently limited and specific, in view of the nature of this extended conspiracy and other crimes for which he was being investigated, to 'allow the executing officers to distinguish between items that may and may not be seized.'" *Id.* at 1362–63 (quoting *United States v. Finnigin*, 113 F.3d 1182, 1187 (10th Cir.1997)). Similarly, in view of alleged conspiracy, which potentially predated the search by four years, and the nature of the crimes charged, which could impact any number of CCI students and could involve numerous CCI staff members, the court finds the warrant to be as specific as the circumstances allowed.

 Defendants next argue that the court should suppress the fruits of the search because the agents exceeded the scope of the warrant. Summarily, defen-

dants state that agents rummaged in an exploratory way through the CCI premises, and took things not specified in the warrant. They argue this requires suppression of all fruits of the search. If officials illegally seize evidence, the general rule is that "only the improperly seized evidence, not all of the evidence, must be suppressed, unless there was a flagrant disregard for the terms of the warrant." *United States v. $149,442.43 in U.S. Currency,* 965 F.2d 868, 875 (10th Cir.1992) (internal quotations omitted). Thus courts have not invalidated a search merely because officials seize some things that the warrant has not specified. This is particularly true when the non-specified items are not admitted into evidence against the defendant. See *United States v. Henson,* 848 F.2d 1374, 1383 (6th Cir.1988). However "[w]hen officers grossly exceed the scope of a search warrant in seizing property, the particularity requirement is undermined and an otherwise valid warrant is transformed into a general warrant," which may require suppression of all evidence seized pursuant to it. *United States v. Foster,* 100 F.3d 846, 849–50 (10th Cir. 1996) (quoting *United States v. Medlin,* 842 F.2d 1194, 1199 (10th Cir.1988)). The court has reviewed the Attachments and the Search Inventory and finds that agents did not seize any significant items that did not fall into a category listed in the Attachments. Agent Kanakares testified that OIG agents seized some documents that had no evidentiary value. However, CCI stored those documents with other potentially critical documents, and agents simply seized the entire files. Under the circumstances, the agents did not grossly exceed the warrant in concluding they did not need to conduct an on-site examination of every piece of paper in every file. See *Henson,* 848 F.2d at 1383–84. Defendants point to the seizure of some personal photographs from desktops. Agent Kanakares testified such photos are helpful in

identifying ownership of a particular desk, and thus fall within Attachment B, item n ("evidence of residency, occupancy and/or ownership of premises and locations described in the warrant"). The court thus denies defendants' motion to suppress based on the alleged illegal execution of the warrant.

▉▉▉▉▉ Finally, defendants argue that the court should invalidate the search warrant due to material omissions from the affidavit in support of the warrant. Defendants assert that agent Kanakares failed to inform the magistrate that CCI had addressed issues relating to the allegations involving the Nebraska Student Loan Program in an administrative appeal. The affidavit also omitted any mention of the fact that CCI had responded to the findings of the DOE's 1998 program review and that CCI was awaiting the DOE's final determination letter and repayment schedule. In *Franks v. Delaware,* the Supreme Court held that it is a violation of the Fourth Amendment for a warrant affiant to "knowingly and intentionally, or with reckless disregard for the truth," include false statements in the affidavit. *Franks,* 438 U.S. 154, 155, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). The Tenth Circuit has extended this rule "to material omissions, as well as affirmative falsehoods." *Stewart v. Donges,* 915 F.2d 572, 582 (10th Cir.1990). Under Franks and Stewart, a defendant must show (1) that the affiant knowingly or recklessly either included affirmative false statements or omitted material facts, and (2) that the affidavit, with its necessary corrections, would not support probable cause. See *Franks,* 438 U.S. at 155–56, 98 S.Ct. 2674, 57 L.Ed.2d 667; *Stewart,* 915 F.2d at 582–83. Where the affiant has omitted information, a determination of probable cause is made "by examining the affidavit as if the omitted information had been included and inquir-

ing if the affidavit would still have given rise to probable cause for the warrant." *Stewart,* 915 F.2d at 582 n. 13.

Arguably, the court could have expected agent Kanakares to inform the magistrate judge of the information mentioned above. However, these facts were not misrepresented, nor was their omission material. The omissions from the affidavit are not material because they post-date defendants' alleged wrongdoing. If defendants knowingly and willingly failed to make refunds, then complying with the DOE review program at a later date does not absolve them of criminal responsibility. Likewise, if defendants engaged in mail fraud in their dealings with the Nebraska Student Loan Program, then taking part in an administrative procedure does not ease their criminal liabilities. Such information simply does not impact upon the finding of probable cause.

Even if the court were to find these omissions material, defendants would still fail the Franks/Stewart test as they failed to show that had these omissions been included in the Affidavit they would have negated probable cause. The Affidavit outlines the alleged CCI scheme with specificity and detail. The Affidavit describes a number of specific examples of violations and specific examples of attempts made to obfuscate the status of the unreturned refunds. As such, the Affidavit presents sufficient information to support a finding of probable cause even if the court includes the omissions discussed above in the litany of facts. The court thus denies defendants' motion to suppress on the ground that the Affidavit in support of the warrant contained material omissions.

## V. Motion to Suppress the Statement of Defendant Hampton

During the execution of the search warrant outlined above, OIG agents conducted interviews of every CCI employee who arrived at the premises. The OIG search team included eleven armed agents, all identified as federal officers, and one uniformed member of the Wichita Police Department ("WPD"). OIG agents posted the WPD officer at the entrance to CCI's parking lot. The officer's duty was to inform CCI students that CCI was not holding classes that day and then direct them on their way. The officer allowed CCI instructors and employees to enter the parking lot where OIG agents met them. The agents would tell the employees that federal agents were executing a search warrant and the basic subject matter of the warrant. Agents would then ask the employees if they would consent to an interview and told them, at the same time, that they were free to leave if they did not wish to speak with the agents. All of the employees agreed to be interviewed. One employee did ask to leave and return at a later time. The agents granted this request and the employee did return later in the day. Agents escorted the remaining employees to a break room on the CCI premises and maintained surveillance of the group at all times. Agents told the employees and instructors they were free to leave, but that they would need an agent escort to move about within the CCI premises. For the most part, all of the employees remained in the break room until their interview.

When defendant Hampton arrived at CCI, agents took her directly to agent Kanakares who informed her that federal agents were executing a search warrant applying to evidence relating to student loan refunds. Agent Kanakares told defendant Hampton that she was free to leave, but that he would like to interview her. She agreed to the interview. Agent Kanakares and another agent escorted Hampton to an interview room. Both agents were present throughout the interview. The interview began shortly after

defendant Hampton's arrival at 8:00 a.m. The agents did not give Miranda warnings at any point during the interview. Around 9:15 a.m., defendant Hampton requested the opportunity to call her attorney. Agent Kanakares immediately escorted her to a room where he allowed her to use the telephone in private. At the conclusion of the call, Hampton told agent Kanakares that she wanted to fax the warrant to her attorney. An agent then escorted her to a different room and gave her a copy of the warrant, which she faxed to her attorney. After waiting between twenty and thirty minutes, Hampton again called her attorney in a private room to discuss the warrant. At the completion of this second call, agent Kanakares again told defendant Hampton that she was free to leave the premises. He further asked if she would continue the interview. She agreed to continue, and the interview lasted another hour and one-half.

■ In *Berkemer v. McCarty*, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984), the Supreme Court held that "a person subjected to custodial interrogation is entitled to the benefit of the procedural safeguards enunciated in Miranda, regardless of the nature or severity of the offense of which he is suspected or for which he was arrested." *Id.* at 434, 104 S.Ct. at 3147 (footnote omitted). From this it is clear that defendant Hampton's rights under Miranda come into play only during custodial interrogation. As to the question of custody, the Supreme Court has held that a person is not in custody for Miranda purposes unless his/her "freedom of action is curtailed to a degree associated with formal arrest." *Berkemer v. McCarty*, 468 U.S. 420, 440, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984) (quotation omitted). Furthermore, courts measure Miranda's "in custody" requirement objectively, the proper inquiry being whether "a reasonable [person] in the suspect's position would have understood his situation ... as the func-

tional equivalent of formal arrest." *Id.* at 442, 104 S.Ct. 3138, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694.

The case of *United States v. Ellison*, 791 F.2d 821 (10th Cir.1986) clearly establishes the principle that a suspect's freedom to depart from the interview and the premises is critical to a finding of non-custody. In *Ellison*, a uniformed officer drove the suspect to the United States Attorney's office. Law enforcement officials made the suspect's travel arrangements. Nonetheless, officers informed the suspect that he was free to leave at any time. Based almost exclusively on the suspect's freedom to leave, the Tenth Circuit found that the interrogation was non-custodial. *Id.* at 823. In the present case, agent Kanakares interrogated defendant Hampton at her place of business. He never told her she was under arrest, but did tell her, at least twice, that she was free to leave the premises. No evidence indicates that the defendant could not have terminated the interview at any time. Moreover, agent Kanakares allowed defendant to make private phone calls to her attorney. See *United States v. Venerable*, 807 F.2d 745, 747 (8th Cir.1986). ("Venerable made and received telephone calls and spoke during the interviews with other employees, and left one interview for a period of time. The district court's findings that, under the totality of the circumstances, the interviews were not custodial are not clearly erroneous."). Further, the mere fact that the defendants were the focus of an investigation does not indicate that they were in custody during the questioning. See *United States v. Chalan*, 812 F.2d 1302, 1306 (10th Cir.1987). In short, the court finds that "a reasonable person in [Hampton's] position," see *Berkemer*, 468 U.S. at 442, 104 S.Ct. 3138, would not have believed that he/she was in the "functional equivalent of formal arrest." *Id.*

The question remains whether defendant Hampton's request to call her attorney alters this result in any meaningful way. This raises the interesting issue of whether the protections offered by *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), apply when a suspect requests to speak to an attorney during a non-custodial interrogation. In other words, must officials terminate a non-custodial interrogation after a suspect has requested to speak to an attorney, or are they free to reinitiate the interrogation after the request? The great weight of authority indicates that Edwards' protections do not apply to non-custodial interrogations. In fact, the Tenth Circuit has directly addressed this issue in *United States v. Bautista*, 145 F.3d 1140 (10th Cir.1998), *cert. denied*, 525 U.S. 911, 119 S.Ct. 255, 142 L.Ed.2d 210. The circuit clearly states:

> Absent either a custodial situation or official interrogation, Miranda and Edwards are not implicated. See *Roberson*, 486 U.S. at 682, 108 S.Ct. 2093 (Edwards applies "after a person in custody has expressed his desire to deal with the police only through counsel,...."); *Michigan v. Jackson*, 475 U.S. 625, 626, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986) ("In Edwards, ..., we held that an accused person in custody...."); *United States v. Roman–Zarate*, 115 F.3d 778, 782 (10th Cir.1997) (no Edwards violation when no "interrogation" occurred); *United States v. LaGrone*, 43 F.3d 332, 339 (7th Cir.1994) ("in order for a defendant to invoke his Miranda rights the authorities must be conducting interrogation, or interrogation must be imminent"); *Alston*, 34 F.3d at 1244 (both needed to trigger Miranda right to counsel); *Tukes v. Dugger*, 911 F.2d 508, 515–516 (11th Cir.1990) ( "[B]ecause [defendant] was not in custody, he may not obtain relief under Edwards."), *cert. de-*

*nied*, 502 U.S. 898, 112 S.Ct. 273, 116 L.Ed.2d 225 (1991).

*Bautista*, 145 F.3d at 1147. The circuit goes on to explain that "Edwards is premised on the inherently coercive nature of custodial interrogation and is designed to prevent the authorities from badgering a suspect in custody after the suspect has invoked his Miranda right to have an attorney present during questioning". *Id.* at 1150 (citing *Roberson*, 486 U.S. at 685, 108 S.Ct. 2093). Simply put, "in order for Edwards to apply, the suspect must be in custody from the time he invokes his right to the time when the subsequent interrogation is initiated." *Id.* Because defendant Hampton was not in a custodial situation at the time she asked to speak to her attorney, the law did not prohibit agent Kanakares from reinitiating the interview. The court thus denies defendant Hampton's motion to suppress her October 20, 1998 statement.

IT IS THEREFORE ORDERED this day of March, 2001, that defendant Hampton's motion to dismiss (dkt. no. 26) is denied in its entirety and defendants' motions to suppress evidence and statements (dkt nos. 24, 31) are denied in their entirety.